The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes as well as the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in a Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury on December 2, 1998, the parties were subject to and bound by the provisions of the Workers' Compensation Act and the employer-employee relationship existed between defendant-employer and plaintiff.
2. Defendant-employer is self-insured with Crawford Company as its servicing agent.
3. Plaintiff's average weekly wage may be determined by a Form 22-wage chart previously submitted to the Commission.
4. Deposition testimony of Dr. Gary Kuzma, Dr. Stanley Harrison and Mr. Al Gorrod is a part of the evidentiary record in this matter.
 ***********
Based upon the evidence of record, the Full Commission finds as fact the following
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a thirty-three year old high school graduate. Plaintiff received basic computer training from Rockingham Community College.
2. Plaintiff began her employment with defendant-employer in 1989 as a "boarder prep" where she operated four machines at once. Thereafter, plaintiff was laid off but called to return to work for defendant-employer in its special items or special order department where she performed "bottom hemming" or hemming the bottom part of drapes including mitering corners.
3. Plaintiff first experienced difficulties with her right hand in December 1998 while performing "bottom hemming". At this time plaintiff worked sewing two drapery panels together, which were 90 inches long at a maximum. Plaintiff used her hands to pick up the drapes, make the corner with her thumbs while sewing and pulling the drape with her hands until she finished the hem. The material for the drapes was behind plaintiff to her right so that she had to reach back and place it in her lap to perform the sewing. In sewing the hem, plaintiff had to grasp the fabric to feed it through the sewing machine. She started by first pulling the fabric which was sometimes heavy with a foam back with her right hand and sewing while constantly moving her right hand while holding and guiding the fabric through the machine with her left hand. Plaintiff's work "bottom hemming" was performed on a production basis and she spent most, approximately 80%, of her workday performing this task until she began to complain about her hand. Plaintiff's supervisor, Ms. Gloria Newman, indicated that plaintiff probably spent 60% of her work day performing the task of "bottom hemming" but admitted that she was not certain that plaintiff did not spend in actuality 80% of her time in that position.
4. When plaintiff was not "bottom hemming," she performed "sewing together" and folding and bagging.
5. The special items department consists of modules or teams of five to six employees who work together to finish a product. The employees rotate through various job tasks. Although there is some dispute regarding the frequency of rotation, the greater weight of the evidence of record indicates that plaintiff did rotate somewhat among various tasks, including sewing together, folding and bagging within the special items department. However, plaintiff performed "bottom hemming" the majority of the time.
6. On approximately December 2, 1998, plaintiff began having difficulty with her right hand. On December 2, 1998, plaintiff was seen by Dr. Scott Luking for a swollen foot unrelated to work. At that time she reported complaints of hand pain, mainly right-sided. Dr. Luking referred plaintiff to orthopedic surgeon Dr. Stanley Harrison for her hand problems. Plaintiff also reported wrist problems to the plant nurse, Ms. Susan Strader, on December 3, 1998.
7. Plaintiff was first seen by Dr. Harrison on January 6, 1999 complaining of right upper extremity pain, which radiated proximally and distally from the elbow into the forearm and shoulder. Dr. Harrison's initial impression was pronator syndrome for which he prescribed anti-inflammatory medications and splints and ordered an EMG and nerve conduction studies. Plaintiff returned to Dr. Harrison on January 15, 1999 at which time the EMG and nerve conduction studies revealed mild carpal tunnel syndrome of the right hand but no pronator syndrome. Based on these studies and plaintiff's evaluation that demonstrated sensory changes of her fingertips and positive Tinel's and Phalen's tests, Dr. Harrison diagnosed carpal tunnel syndrome.
8. Thereafter, plaintiff continued to perform "bottom hemming" but for a smaller portion of the day and began to perform additional "sewing together" and folding and bagging.
9. Dr. Harrison continued to treat plaintiff conservatively during January and February 1999 with splints and injections to her right wrist.
10. On May 20, 1999, plaintiff first presented to Dr. Gary Kuzma, an orthopedic surgeon and hand specialist in Greensboro. Dr. Kuzma's physical examination revealed pain and a slightly positive Tinel's to the elbow but most of the exam was negative for carpal tunnel syndrome. However, he prescribed a short course of steroids, which would decrease any swelling in the tissues surrounding the median nerve in the carpal tunnel, and diagnosed arm pain. Dr. Kuzma further reviewed two previous nerve conduction studies and concluded that both were "borderline" for carpal tunnel syndrome.
11. Dr. Kuzma took the employee out of work on June 9, 1999. However, despite the fact that she was out of work, Dr. Kuzma's office notes of July 12, 1999, and July 27, 1999, indicate that she continued to complain of pain in her right hand and arm.
12. In early August 1999, Dr. Kuzma ordered a repeat nerve conduction study, which revealed mild changes bilaterally, borderline on the left and motor delay and sensory delay on the right. Thereafter, Dr. Kuzma injected plaintiff's right carpal canal with Celestone and Xylocaine and instructed her to return in two to three weeks.
13. Plaintiff returned to Dr. Harrison on August 17, 1999 with worsening symptoms of her right wrist and additional left sided symptoms. Dr. Harrison diagnosed left carpal tunnel syndrome. Plaintiff underwent right carpal tunnel release surgery on August 19, 1999.
14. As of September 20, 1999, plaintiff's carpal tunnel syndrome had mostly resolved. However, while recovering from the carpal tunnel surgery, plaintiff developed shoulder pain, which was the result of a new and non-work-related disk problem. As a result of this right shoulder pain, Dr. Harrison kept the employee out of work longer than he normally would have following the carpal tunnel surgery. According to Dr. Harrison, but for the development of the unrelated disk problem, he would have expected the employee to have returned to work approximately four to six weeks after her surgery on August 19, 1999. On October 14, 1999 plaintiff's shoulder pain progressed and plaintiff had paresthesia of her right hand. X-rays revealed no significant findings of arthritis or stenosis. Dr. Harrison ordered an MRI and proscribed Vicodan.
15. Plaintiff returned to Dr. Harrison on October 25, 1999 at which time the MRI and radiologist's report indicated degenerative disc disease from C2 through C7 with no neural compression. Plaintiff was treated conservatively and release to return to work on October 26, 1999. Plaintiff additionally developed tendonitis, which Dr. Harrison indicated was merely possibly related to her employment.
16. While Dr. Kuzma testified that he did not believe that plaintiff's carpal tunnel syndrome was caused by plaintiff's employment with defendant-employer, he indicated that plaintiff's employment could have accelerated the onset of her carpal tunnel syndrome. Dr. Harrison indicated that plaintiff's employment could significantly contribute to the development of carpal tunnel syndrome as well as place plaintiff at an increased risk of developing carpal tunnel syndrome as compared to the general public not so exposed. Dr. Harrison's opinions are given greater weight than those of Dr. Kuzma.
17. At the request of defendant, Mr. Al Gorrod performed an ergonomic evaluation of plaintiff's position within the special items department and observed plaintiff performing the "bottom hemming" job. Mr. Gorrod evaluated "bottom hemming" as well as "sewing together" and folding and bagging for various ergonomic risk factors including repetition. The positions of "bottom hemming" and folding and bagging placed plaintiff in the moderate risk category. Although Dr. Gorrod found plaintiff to be at low risk overall of developing a repetitive motion disorder when rotating through the three positions, the greater weight of the evidence, including Mr. Gorrod's testimony and the medical testimony, indicates that plaintiff was nevertheless placed at a greater risk that the general public of developing carpal tunnel syndrome as a result of performing "bottom hemming" and folding and bagging.
18. Plaintiff's employment with defendant-employer significantly contributed to her development of carpal tunnel syndrome and she was at a greater risk of developing carpal tunnel syndrome as compared to the general public not so exposed.
19. Plaintiff returned to work on October 26, 1999, at her usual wages. Plaintiff has reached maximum medical improvement with regard to her carpal tunnel syndrome but Dr. Harrison has not yet evaluated plaintiff for a rating.
20. Plaintiff's average weekly wage is $348.31 yielding a weekly compensation rate of $232.22.
 ***********
Based upon the foregoing stipulations and findings of fact, the concludes as follows
 CONCLUSIONS OF LAW
1. Plaintiff's employment with defendant-employer significantly contributed to her development of carpal tunnel syndrome and she was at a greater risk of developing carpal tunnel syndrome as compared to the general public not so exposed. Accordingly, plaintiff has sustained a compensable occupational disease, carpal tunnel syndrome, as a result of her employment with defendant-employer. N.C.G.S. § 97-53(13).
2. As a result of plaintiff's occupational disease, she is entitled to temporary total disability benefits a the rate of $232.22 per week beginning June 9, 1999 and continuing until she returned to work on October 26, 1999. N.C.G.S. § 97-29.
3. Subject to the limitations of N.C.G.S. § 97-25.1, plaintiff is entitled to payment for reasonably necessary medical treatment for her carpal tunnel syndrome for as long as the same tends to effect a cure, provide relief or lessen the period of plaintiff's disability. N.C.G.S. § 97-25.1; N.C.G.S. § 97-25.
4. As a result of plaintiff's occupational disease, she may be entitled to permanent partial disability benefits. However, no rating has been provided by Dr. Harrison at this time. N.C.G.S. § 97-31.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendant shall pay to plaintiff temporary total disability benefits a the rate of $232.22 per week beginning June 9, 1999 and continuing until she returned to work on October 26, 1999, subject to a reasonable attorney's fee. All amounts have accrued and shall be paid in one lump sum.
2. Subject to the limitations of N.C.G.S. § 97-25.1, defendant shall pay for reasonably necessary medical treatment for plaintiff's carpal tunnel syndrome for as long as the same tends to effect a cure, provide relief or lessen the period of plaintiff's disability.
3. The issue of plaintiff's permanent partial disability is hereby reserved.
4. An attorney's fee in the amount of 25% is hereby allowed and shall be paid by deducting 25% of the award due plaintiff to be paid in one lump sum directly to plaintiff's attorney.
5. Defendant shall bear the costs due the Commission and pay an expert witness fee of $325.00 to Dr. Stanley E. Harrison and $300.00 to Dr. Gary Kuzma if not already paid.
This the ___ day of October 2001.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER